(Lucas County Common Pleas.)

May 9. 1900.

## THE KERLIN BROTHERS COMPANY v. THE CITY OF TOLEDO.

## THE CITY OF TOLEDO et al. v. THE KERLIN BROTHERS COMPANY et al.

## THE CITY OF TOLEDO, BY MOSES R. BRAILEY. City Solicitor, v. THE CITY OF TOLEDO et al.

(1). The common council of the city of Toledo passed an ordinance granting to the Kerlin Bros. Co. the right to maintain and operate a gas plant in the said city. Prior to the passage of said ordinance by the board of councilmen. the term of office of eight members of the board of aldermen had expired and after the passage of said ordinance on the same day the term of office of fifteen members of the board of councilmen expired. Held, under sec. 1691, R. S. which provides that "the council shall not enter into any contract which is not to go into full operation during the term for which all the members of such council are elected" the said ordinance was illegal and void.

(2). The Kerlin Bros. Co. filed a written bid for the purchase of the Natural Gas Plant of the city of Toledo, in which they offered to pay $102,000.00 for that part of the plant lying outside of the city; $126.000.00 for that part lying within the city, and $228,000 00 for the entire plant. The bid was made upon the condition that the city will grant to said company, by ordinance. satisfactory to them, the right to maintain and operate the natural gas plant in the city, and also fixing satisfactory to them the price which they may charge consumers for gas. It was provided in said bid that payment of the purchase price was to be made in case of the acceptance of the bid or any part thereof, in twenty days after the passage and due publication of the necessary ordinances and resolutions conveying said property, and granting the right to furnish gas and fixing the price. The council by separate resolutions, accepted, without qualification. the two bids or the two parts of said bid for the separate parts of the plant. Held, the condition that the city shall grant to the company the franchise ordinance was attached to the company's bid for the inside part of the plant, and the contract of sale of the said inside part was not completed until the passage of the franchise ordinance, and therefore, under sec. 1691, R. S., all the

proceedings relating to the sale of the inside part of the plant were void.

(3). In order to make a valid sale of the Gas Plant, it was necessary, under sec. 2673a, R. S., to advertise for bids, and in order to secure a free and fair competition among bidders, the bids should respond to the advertisement.

(4). The Kerlin Bros. Co. included in their bid the granting of an ordinance fixing satisfactorily to themselves the price they should charge for gas - an important right not mentioned in the advertisement, and presumably unknown to bidders. As to that ordinance, there was no competition, and it was not competent for the council to enter into a contract based on such a bid.

(5). Under sec. 2673a, R. S., a resolution indicating an intention to offer the gas plant for sale, or action on the part of the council in the nature of a resolution, was necessary. The offer could be made only upon the vote of three-fifths of the members of the council.

(6). The resolution of the council directing the clerk to advertise for bids was under the circumstances of the case a resolution of a general and permanent nature, and under sec. 1694, R S., should have been read on three different days, or the rule requiring three readings should have been suspend d by a vote of three-fourths of the members elected. By reason of the failure of the council to pursue the steps required by said section. the resolution was not properly adopted, and the sale of both parts of the plant was void.

(7). Neither the payment into the city treasury of the purchase price of the outside part of the plant, nor the resolution of the council directing the gas trustees to deliver the property to the purchasers, is a defense to an action by the city solicitor under sec. 1777, R S., to enjoin the consummation of the sale.

(8). Public officers, as such, have no right to bring suits in their own names, unless authorized to do so by statute. Under this rule, the suit by the Natural Gas Trustees to enjoin the sale of the Gas Plant, was unauthorized. They are not "trustees of an express trust" within the meaning of sec. 4995, R. S.

(For decision of Circuit Court in this case see 20 C. C., 603.)

PUGSLEY, J.:

Three actions have been brought in this court which involve the question as to the validity of the sale or attempted sale of the Toledo natural gas plant. made by the city of Toledo to The Kerlin Bros. Co. The first of these actions in the order of commencement is No. 45,836—the case of Kerlin Bros.

Co. vs. The City of Toledo—which was begun on April 11. This is an action of replevin. It was brought to recover possession of the personal property used or connected with the Toledo natural gas plant which lies outside the city of Toledo. The plaintiff alleges in its petition that it is the owner and entitled to the immediate possession of said property, and that the same is wrongfully detained by the defendant. The defendant, the city of Toledo, through the city solicitor, has filed an answer and cross-petition, in which it sets out the various proceedings had and taken with reference to the sale of the gas plant. The cross-petition concludes with this prayer:

"Wherefore defendant prays that plaintiff, its agents and servants, may be temporarily restrained from in any manner taking possession of the property described in plaintiff's petition or any part thereof, and be further enjoined and restrained from accepting the said ordinance pretended to have been granted by the common council of the city of Toledo conferring a gas franchise on plaintiff, and from in any manner doing any act or acts with the intent of rendering the said pretended ordinance a valid contract between the city of Toledo and plaintiff; and that upon the final hearing of this cause plaintiff's petition be dismissed. and said temporary restraining order or orders be made perpetual, and that said pretended sale of the property described in plaintiff's petition or any part thereof, and said pretended grant of said gas rights and franchise and all proceedings had in connection therewith or in relation thereto, be declared null and void and of no force or effect; and this defendant prays for such other, further and different relief as equity and good conscience may require."

The second action is No. 45,845, commenced on April 13, and was brought by the city of Toledo, the three members of the board of natural gas trustees of the city, and the mayor of the city against The Kerlin Bros. Co. and others. The prayer of the petition in this case is in part that the Kerlin Bros. Co. be enjoined from prosecuting their said replevin action, and from taking possession of any part of the property described therein, and from interfering with the city's possession of said natural gas plant, and from accepting the said franchise ordinance. On the filing of this petition an order was issued restraining the defendants as prayed for until a motion for an injunction should be heard and determined, and which motion was filed at once.

The third action is No. 45,876, begun on April 19. It was brought by Moses R. Brailey, city solicitor, in the name of the city of Toledo, against the city of Toledo and others. The prayer of the petition in this case is in part that The Kerlin Bros. Co. be enjoined from taking possession of that part of the natural gas plant lying inside of the city, and the real estate connected with the gas plant lying outside of the city, and also from accepting the said franchise ordinance. This action was brought under section 1777 R. S., which reads as follows:

"He (that is, the city solicitor) shall apply in

the name of the corporation, to a court of competent jurisdiction for an order of injunction to restrain the misapplication of funds of the corporation, or the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the corporation in contravention of the laws or ordinances governing the same, or which was procured by fraud or corruption."

In this same connection I will read section 1778:

"In case he fail (that is, the city solicitor) upon the request of any tax payer of the corporation to make the application provided for in the preceding section, it shall be lawful for such tax payer to institute suit for such purpose in his own name, on behalf of the corporation; provided, that no such suit or proceeding shall be entertained by any court until such request shall have first been made in writing."

I will say that the cross-petition which was filed by the city solicitor in the replevin case was also filed under sec. 1777.

These three actions which I have thus briefly described were heard together upon the pleadings and upon the admitted facts, and were submitted to the court for a final decree in each case. The questions involved are numerous and important, and they have been fully and ably argued by counsel for the several parties. I have given to these questions, and to all of them, such consideration as their importance seemed to demand, but in what I have to say I will undertake to discuss only a few of them —such questions as seem to me to be vital and controlling.

A good deal was said in the argument as to the advisability of selling the gas plant and as to the benefit as claimed on one side, and the detriment, as claimed on the other side, that will accrue to the city from the sale as made or attempted to be made. Of course, as counsel understand, this is a matter over which the court has no control. The advisability of selling the gas plant and the policy to be pursued are matters which are properly and necessarily vested in the discretion of the common council, with which the court has no power to interfere. The question which is submitted for decision, and the only question, is, in brief, whether there are such defects or irregularities in the proceedings of the common council as will warrant the court, under all the facts of the case, in enjoining the performance or carrying out of the contracts of sale. Matters of expediency or wisdom, or want of wisdom in the action of the council cannot affect the judgment of the court upon purely legal questions.

The first official step looking towards a sale of the gas plant was the passage by the council upon the ninth of October, 1899, of a resolution which reads as follows:

"Resolved by the Common Council of Toledo, that the city clerk be instructed to advertise for bids for the sale of that part of the city of Toledo natural gas plant lying outside of the city of Toledo. Bids will be received separately on that part lying within the city and that part lying outside of the city."

This resolution was passed by each board of the council, was vetoed by the mayor, and subsequently passed by each board over the veto. Thereupon the city clerk published a notice for bids, which reads as follows:

"Notice—Proposals for the Sale of the City Natural Gas Plant.

"Sealed proposals will be received at the office of the city clerk of the city of Toledo, by the undersigned, up to 12 o'clock (standard time) M., of Monday, the fourth day of December, 1899, for the purchase of the separate parts of the city natural gas plant as hereinafter mentioned, together with all its appurtenances, including all pipes and connections laid in the city of Toledo, Ohio, pipe lines and connections elsewhere, together with all wells, rights in wells, tubing, and all machinery, appliances, tools, materials, lands, leases and leasehold-interests, now owned and held by the said city in connection with its natural gas plant, with the right to lay down and maintain and operate in the streets, alleys and public places of said city, gas pipes and their connections, for the purpose of supplying natural and manufactured gas to consumers in said city. The purchaser to assume all the obligations pertaining to said property and leases, from and including the date of purchase.

"Separate bids only will be received for that part of the natural gas plant lying within the city, and for that part of the natural gas plant lying outside of the city. Intending bidders can obtain a description of all of said gas property owned or controlled by the city of Toledo by calling upon the undersigned."

Then follows the requirement that a certified check shall be deposited with the clerk with the bid.

"The city reserves the right to reject any and all bids which may be offered.

"By order of the Common Council.
                "WM. O. HOLST, City Clerk."

Subsequently, upon the fourth of December, 1899, two bids were filed in the office of the city clerk, one of which was by The Kerlin Bros. Co., as follows; and as a good deal depends upon this bid, and the construction to be given it, I will read the whole bid:

                "Toledo, Ohio, December 4, 1899.
"To the Hon. Common Council of the City of Toledo:

"Gentlemen: In response to your published invitation for bids, a copy of which is hereto attached, the undersigned will pay for all that part of the property of said city of Toledo (as advertised) owned, used or connected with the city natural gas plant, as described in said advertisement and shown by description mentioned in said advertisement, and lying outside of the city, the amount of $102,000, and will pay for that part of the property of said city of Toledo (as advertised) owned, used or connected with the city natural gas plant as described in said advertisement, and lying within the city, the sum of $126,000. Or will pay for the whole of said natural gas plant, and all parts and parcels thereof, whether lying within or without said city, and as described in said advertisement and as shown by the description in said advertisement, the sum of $228,000.

"This bid is made upon the following express condition: That the city of Toledo, Ohio, if the undersigned so elect, will grant them by ordinance satisfactory to them, the right to continue to operate said city natural gas plant, and to take up the same, and to lay down and maintain gas pipes, and their connections, and all necessary appliances to enable them to continue the supplying of gas to consumers in said city, in the same manner as is now done and proposed to be done by the present operation of said plant. Also fixing satisfactory to them, the price they may charge consumers for gas.

"The undersigned to assume only such obligations as arise from and after the date of purchase, but not to be liable for any obligations that have or may accrue or arise before said date.

"The amounts bid to be paid in case of the acceptance of this bid, or any part thereof, within twenty days after the passage and legal publication of the necessary ordinances and resolutions conveying said property to the undersigned, and granting to them the right to furnish gas, fixing the price, etc., above referred to.

"A certified check on the National Bank of Commerce of Toledo, Ohio, for the sum of $15,000, payable to the order of said city, deposited herewith.

"Respectfully submitted,
"THE KERLIN BROTHERS COMPANY,
"By E. M. KERLIN, Secretary."

The other bid is by Charles D. Hauk, and is as follows:

"To the Honorable Council of the City of Toledo:

"I, the undersigned, Charles D. Hauk, hereby bid for the property of the natural gas plant department, under your printed notice for "Proposals for the sale of the natural gas plant of the city of Toledo, Ohio," as follows:

"For said property lying inside of the city limits, including franchises, $115,000; for said property lying outside of the city limits, $90,000 for the entire property, including franchises, $205,000. Said property is shown by a schedule hereto attached marked "A."

"I hereby enclose my certified check for $15,000, as required by said printed notice.

"CHARLES D. HAUK."
"Toledo, Ohio, December 4, 1899."

Thereafter, on the eleventh day of December, 1899, separate resolutions were introduced into the board of councilmen and passed by that board upon said day, which resolutions accepted the bid of The Kerlin Bros. Co. One of these resolutions I will read, and that will be sufficient:

"Resolution accepting the bid of The Kerlin Brothers Company for gas plant lying outside of the city of Toledo.

"Resolved by the Common Council of the City of Toledo, Ohio, that the proposal of The Kerlin Brothers Company for the purchase of all that part of the property (as advertised) owned, used or connected with the city natural gas plant, lying outside of the city of Toledo, with its appurtenances, including all mains, pipes, gas and oil wells, gas and oil leases, meters, materials, machinery, land and appliances appertaining or belonging to said plant, or used in connection therewith, at the price of $102,000 be and the same is hereby accepted, and upon the payment of the purchase money, the mayor and city clerk are hereby authorized and directed to execute and deliver to said The Kerlin Brothers Company, proper deeds and conveyances of all said property."

The other resolution is similar, except that it is the acceptance of the bid of The Kerlin Bros. Co. for that part of the gas plant lying inside of the city, at the price of $126,000.

These resolutions were subsequently passed by the Board of Aldermen. Each was vetoed by the mayor, and each was subsequently passed by both boards over the veto—the resolution as to the outside part on January 8, 1900, and the resolution as to the inside part on February 7th.

On February 26 The Kerlin Brothers Company caused to be prepared and introduced in the Board of Aldermen two ordinances, one of which is called the "franchise ordinance," the other fixing the price of gas to be charged by the said company, which is called "the rate ordinance." The franchise ordinance is entitled as follows:

"An ordinance granting unto The Kerlin Brothers Company of Toledo, Ohio, the right and privilege to erect, lay, maintain and operate a gas plant, together with the necessary gas pipes, and other appurtenances in the city of Toledo, for the purpose of supplying the inhabitants thereof with natural and manufactured gas for illuminating, heating and power purposes, and providing for the purchase of said gas plant, pipes, etc., by the city of Toledo, Ohio."

This ordinance contains numerous provisions. I will not stop now to read them, but may have occasion hereafter to refer to some of them. This ordinance was adopted by the Board of Aldermen on February 26th, the day it was introduced, and by the Board of Councilmen on March 5th. It was vetoed by the mayor, and on March 28th was adopted over the veto by the Board of Aldermen. On April 5th the ordinance was considered by the Board of Councilmen, but it failed of adoption over the mayor's veto. Thereafter, at a special meeting of the Board of Councilmen, on April 11th, upon a reconsideration, the ordinance was adopted by that board. The history of the rate ordinance from the time it was introduced into the Board of Aldermen on February 26th is the same as that of the franchise ordinance, except that at the special meeting of the Board of Councilmen on April 11th, it failed of adoption over the mayor's veto. On the ninth of March, which was after both of these ordinances had passed both boards of the council and were in the hands of the mayor, The Kerlin Bros. Co. filed this written communication with the Common Council:

"Toledo, Ohio, March 9, 1900.
"To the Honorable Common Council of the City of Toledo, Ohio:

"Gentlemen: The undersigned, The Kerlin Brothers Company, of Toledo, Ohio, hereby

give you notice that they have accepted and do hereby accept the terms and conditions of certain legislation passed by your honorable body on the fifteenth day of January, 1900, selling to them all that part of the property of the city of Toledo, owned, used or connected with the city natural gas plant, lying outside of the city of Toledo, with its appurtenances, including all mains, pipes, gas and oil wells, gas and oil leases, meters, materials, machinery, lands and appliances appertaining or belonging to said plant or used in connection therewith as described in said legislation.

"We hereby waiving any conditions in our bid, expressed or implied, as to the sale of the property above described, which may require the granting to us of a franchise to sell gas in the city of Toledo, and fixing the price thereof.

"Very respectfully yours,
"The Kerlin Brothers Company,
"By R. G. Kerlin. President."

On the next day (March 10th), the company paid to the city treasurer the sum of $102,000, and took from the treasurer the following receipt:

"City Treasurer's Office,
"Toledo, Ohio, March 10, 1900.

"Received from The Kerlin Bros. Co. to be placed to the credit of sinking fund, one hundred and two thousand and 00-100 dollars ($102,000.00). For purchase of gas plant (outside.)

"Jos. L. Yost, Treasurer.
"F. S. Hodgman. Deputy."

On April 5th the council passed this resolution:

"Resolved by the Common Council of Toledo, That the Common Council of Toledo, having by proper legislation, sold to The Kerlin Brothers Co. all that part of the natural gas plant of said city lying outside of said city, described in said legislation at and for the sum of one hundred and two thousand dollars. And said The Kerlin Brothers Company having paid into the treasury of said city said sum of $102,000, and the same having been accepted by said city, and the said The Kerlin Brothers Company being now the owner of said described property, and the said city is incurring great damages; therefore the natural gas trustees of the city of Toledo are hereby authorized and directed to surrender and deliver possession of all of said property, including all real estate included therein, to said The Kerlin Brothers Company.

"And the city clerk is directed to send a copy of this resolution to said natural gas trustees at once upon its passage."

This is substantially a statement of all the proceedings that I shall have occasion to refer to.

The first objection which I will notice is the one relating to the franchise ordinance. It is claimed that under and by virtue of Sec. 1691, R. S., the contract or proposed contract evidenced by this ordinance never went into operation, and cannot now be legally enforced. Sec. 1691 reads as follows:

"The council shall not enter into any contract which is not to go into full operation during the term for which all the members of such council are elected."

By sec. 1695 it is provided that—

"By-laws, resolutions and ordinances shall be authenticated by the signature of the presiding officer and clerk of the council. Ordinances of a general nature, or providing for improvements shall be published in some newspaper of general circulation in the corporation. No ordinance shall take effect until the expiration of ten days after the first publication of such notice."

Sec. 11 of the franchise ordinance itself reads as follows:

This ordinance shall take effect and be in force from and after its passage and legal publication, and the written acceptance of the terms and conditions hereof by the said The Kerlin Brothers Company filed with the city clerk of said city. This ordinance and the acceptance to constitute a binding contract between said city and said company, its successors and assigns, and the terms hereof shall not be changed without the consent of both parties."

As I have said, this ordinance was finally passed by the board of aldermen over the mayor's veto upon March 28th, and by the board of councilmen over the mayor's veto on April 11. The term of office of eight members of the board of aldermen who were in office March 28, expired April 9th, and the term of office of fifteen members of the board of councilmen who were in office April 11th expired on that day. It thus appears that the term of office of eight members of the common council expired before the ordinance was finally passed, and that the term of office of fifteen other members of the common council expired before the ordinance could take effect by publication, and that therefore the contract evidenced by the ordinance did not and could not go into operation during the term for which all the members of the council were elected; and by Sec. 1691 the council is prohibited from entering into such a contract. So far, then, as the franchise ordinance standing by itself is concerned. I know of no reason, and as I understand no reason has been urged, why Sec. 1691 does not apply. Under that section the ordinance was in contravention of law, and void, and injunction will lie at the suit of the city solicitor, under Sec. 1777, to restrain its publication and acceptance, and all proceedings thereunder.

A more important question remains. It is claimed by the city solicitor and those united with him that the franchise ordinance and the resolutions accepting the bids for separate parts of the plant are parts of one and the same transaction, and that until the whole is completed by the legal passage of the ordinance, the company has acquired no right to the property. It is contended on the other hand by the company that the franchise ordinance stands by itself. and was enacted without reference to and independently of the sale of the property or the acceptance of their bids for the property. This requires a consideration of all the proceedings that were taken after the bid of the company was made. In the

bid of the company they first offer $102,000 for the part of the plant lying outside of the city. They next offer $126,000 for the part lying within the city. They then offer for the full plant $228,000, which is the sum total of the amounts offered for the parts separately. They then say: "This bid is made upon the following condition." Then follows the condition which I have read. It is said by counsel for the company that the words "this bid," refer only to the offer immediately preceding, namely, the offer of $228,000 for the whole plant; and that the condition does not apply, does not attach, until that offer for the whole plant or when that offer for the whole plant is accepted. There seems to be nothing on the face of Kerlin's proposal which limits the words "this bid" to any particular offer. But if there is any doubt about it, it is entirely removed by what follows. After giving the conditions, they say this:

"The amounts bid to be paid in case of the acceptance of this bid, *or any part thereof*, within 20 days after the passage and legal publication of the ordinances and resolutions conveying said property to the undersigned, and *granting them the right to furnish gas, fixing the price of gas, etc., above referred to.*"

It thus appears that it is proposed by the company, if any part of their bid is accepted, the amount of the bid is not to be paid until after the necessary ordinances are passed granting them the various rights stipulated for in the condition, and fixing the prices which they may charge for gas. Can there be any doubt, then, that the condition is attached to whatever part of their bid is accepted, provided it is applicable to such part of their bid? I do not think it applies to their bid for the outside part of the plant, because it could not have been in the contemplation of the parties that in buying the outside part alone they were to get a franchise for a gas plant within the city. This distinction was probably in the mind of the other bidder when he made his bid, for he bids a certain sum for the inside part including franchises (meaning undoubtedly the franchise mentioned in the clerk's notice), and he bids a certain sum for the whole plant, including franchise, and then he bids a certain sum for the outside part, saying nothing about franchise. It seems clear, however, that the company bid for the whole plant and for the inside part of the plant on condition that if they shall elect, the city will grant to them by ordinance the right to continue to operate the city natural gas plant, and fixing the price which they may charge consumers for gas satisfactorily to themselves. This is the plain reading of their bid. The council then passed a resolution accepting without qualification the bid of the company for the inside part as made, thereby saying in effect "We accept your bid, and will give you the ordinance mentioned in the condition, if you shall so elect." No other construction, as it seems to me, can be put upon the resolution of acceptance. Hence, the purchase price was not payable, and the transaction of sale was not completed until after the passage and due publication of the ordinances if they should

elect to have ordinances. The company did elect to take the ordinances, for they themselves caused to be prepared and introduced into the council such ordinances as they desired, one for the franchise and the other fixing the price of gas. The franchise ordinance as introduced and passed I think, shows upon its face that the sale was not to be complete until the ordinance should be passed. Sec. 9 of the ordinance is as follows:

"In the event said city shall exercise its right to purchase said property as provided in sec. 7 of this ordinance, the price to be paid for said property by said city shall be arrived at as follows:

"The purchase price that said The Kerlin Brothers Company are to pay to the city of Toledo for its present gas plant lying within the limits of said city, to-wit: the sum of $126,000, less the reasonable value of any part of said present plant which may be removed or destroyed, and plus the cost of all additions, acquirements, improvements, extensions and betterments, including the cost of erection of the plant for manufacturing gas that maybe added from time to time, shall be the price which the said city of Toledo shall pay for said plant."

It is thus said in this section, which speaks of course as of the date of its passage, that the gas plant is still the gas plant of the city, and that the company was yet to pay the purchase price, and by the terms of the bid of the company that was accepted by the city, the purchase price was not payable until 20 days after the passage and legal publication of the necessary ordinances granting the right to furnish gas and fixing the price. There was no action of the council, and nothing in the conduct of the parties to indicate any change in the understanding and agreement that the company was to have these ordinances before the purchase price was payable. My conclusion is that the acceptance of the company's bid for the inside part of the plant and the passage of the franchise ordinance as well as of the gas rate ordinance, were indivisible parts of one transaction, and that the contract of sale of the inside part of the plant was not completed and could not be completed or go into operation during the term for which all the members of the council were elected; and therefore, under sec. 1691, R. S., that all the proceedings relative to the sale of the inside part of the plant are void. No question arises as to a waiver by the company of the conditions attached to the sale of the inside part of the plant, because no waiver was made or attempted until after the passage of the franchise ordinance, and in fact not until after this litigation had begun. If a new contract was to be made between the city and the company, proceedings must be begun de novo.

I will consider another claimed irregularity, which relates only to the sale of the inside part of the plant. In the clerk's published notice, bids were invited for the purchase of the gas plant together with the right to lay down and maintain and operate in the streets,

alleys, and public places in said city, gas pipes and their connections, for the purpose of supplying natural and manufactured gas to consumers in said city. The Kerlin Bros. Co. bid for the inside part of the plant the sum of $126,000 on condition that if they should so elect the city would grant them by ordinance satisfactory to them the right to continue to operate said city natural gas plant, and also fix satisfactorily to them the price they might charge consumers for gas; and the council accepted their bid as so made. The bid and acceptance were considerably broader than the clerk's notice, and included one matter at least which was not mentioned in the notice, namely, the right of the bidders to have, if they shall so elect, an ordinance fixing satisfactorily to themselves the prices they shall charge consumers for gas. The claim is that the city had no right to make such a contract or to accept such a bid, and that varying as it does so materially from the advertisement for bids, the contract is contrary to law and void. The only statute which prescribes the manner in which a sale of corporate property shall be made, in section 2673a, which reads as follows:

"That the council of any city or village, which has not a board of improvements, or board of public works, shall have power, three-fifths of all the members elected thereto voting therefor, to offer for sale or lease any real estate and appurtenances belonging to such city or village, and place the proceeds arising therefrom to the credit of such fund or funds as to said council may seem proper; provided, that invitation of written bids for such sale or lease shall be first published for two weeks in some newspaper of general circulation in such city or village, and the sale or lease shall be awarded to the highest and best bidder, but all bids may be rejected."

The first question that arises is whether this section applies to this case; in other words, whether, among other things, it was necessary in this case to advertise for bids in offering this plant for sale. It will be noticed that the statute speaks only of the sale of real estate and appurtenances. It is contended on the one side that the entire gas plant, consisting of gas wells, pumping stations, lines of pipe buried in the ground, land, buildings, leasehold interests and their attachments, is real estate and appurtenances within the meaning of this section. On the other side, it is contended that, with the exception of the land which is owned by the city in fee, the entire plant is personal property. This is an important question. I do not consider it necessary to decide it, because it is admitted that a part of the plant is real estate, and to sell that part it was clearly necessary to advertise for bids. Inasmuch as the council offered for sale the plant as an entirety, real estate and all, except as it is divided by the city line. I am of the opinion that in order to make a valid contract of sale of the plant as offered, it was necessary to proceed under this section. The real estate was an integral part of the plant as offered for sale and sold. Any action or omission of the council that will vitiate the sale of the real estate must vitiate the sale of the plant of which the real estate is a part. In order to secure a free and fair competition among bidders, it is necessary that the bids shall respond to the advertisement. It is familiar law governing contracts by public officers that a valid contract can be founded only on a competitive bid. Here the Kerlin Brothers Company went beyond the advertisement and included in their bid the granting of an ordinance fixing satisfactorily to themselves, the price they should charge for gas; an important right not mentioned in the advertisement, and presumably unknown to the bidders. As to that ordinance there was no competition. Under the authorities it was not competent for the council to enter into a contract based on such a bid. In the case of Pease v. Ryan, 7 C. C., 44, it was held that under a statute which requires public officers to make plans and specifications for improvements and advertise for proposals for making the same, and to contract with the lowest bidder, it is not competent for them to award the contract to one whose proposal is for materials not mentioned in the specifications and advertisement, as each proposal not competitive, and the performance of a contract bond on such proposal will be enjoined under secs. 1777 and 1778, R. S. To the same effect are Lake Shore Foundry v. Cleveland, 8 C. C. R., 611; Miller v. Pierce, 2 Cin. Ct. S. C. Rep., 44; Brady v. Mayor, 20 N. Y., 316. For this reason also I think that the contract for the sale of the inside part of the plant was void.

There is another objection to the sale of the inside part of the plant which is entitled to serious consideration, but which I shall not stop to discuss; and that is, whether a contract is valid which gives to The Kerlin Brothers Company the right to fix the price which they may charge for gas to suit themselves. It is settled law that a municipal corporation cannot delegate its legislative powers. The power to regulate the price of gas, is vested by law in the common council for the public benefit, and cannot be delegated to others. The objection is that in accepting the bid of The Kerlin Brothers Company for the inside part of the plant which was upon the condition of their having the ordinance fixing the price which they may charge for gas satisfactorily to themselves, the council wrongfully attempted to abdicate its control over a matter which is held by it in trust for the benefit of the public, and that a contract so made, for that reason, is void.

Another objection made to the regularity of the proceedings of the council, and which relates to the sale of both parts of the plant, is that the resolution directing the clerk to advertise for bids was not passed in the mode prescribed by law. The resolution was read in each board of the council on only one day, and without a suspension of the rules which require a reading on three different days. Sec. 1694 R. S., reads as follows:

"By-laws, resolutions and ordinances of a general or permanent nature shall be fully and distinctly read on three different days, unless three-fourths of the members elected dispense

with the rule; and the vote on such suspension shall be taken by yeas and nays, separately on each by-law, resolution or ordinance, and entered on the journal."

The claim is that this resolution was of a general or permanent nature, and not having been passed in the manner prescribed by sec. 1694, it was illegal and void. The first question arising is, whether any resolution was necessary. I have already held that the plant being offered as an entirety, and consisting in part of real estate, sec. 2673a applied. That section gives to the council the power to offer for sale real estate and appurtenances belonging to the city, provided an invitation of bids is first published. In offering the property for sale some action of the council is necessary, either by order or resolution or ordinance, because by the express terms of the statute the offer can be made only upon the vote of three-fifths of the members of the council. In this case the only thing done to indicate the offer was the passage of the resolution directing the clerk to advertise for bids and the publication by the clerk of the notice to bidders. It may be that something more was required on the part of the council to constitute an offer of the property for sale, within the meaning of sec. 2673a, but a resolution or something in the nature of a resolution, upon which a vote of the council could be taken, indicating the intention of the council to offer the property for sale was necessary.

The next question is, whether the resolution was, of a general or permanent nature. When this matter was first presented I was very strongly of the impression that a resolution simply directing the clerk to advertise for bids could not be regarded as a resolution of a general or permanent nature, but after considering the nature of the subject matter to which the resolution relates, which, according to the authorities, is the test, and upon considering the fact that the resolution was the only action of the council indicating an intention to offer the property for sale, and especially after examining the recent decisions of the Supreme Court in analogous cases, I can come to no other conclusion than that the resolution is one of both a general and permanent nature, within the meaning of sec. 1694. I will first refer to some of the decisions. In the case of Campbell v. Cincinnati, 49 O. S., 463, an action was brought to enjoin two assessments, one to pay for property condemned to open a street, and the other to pay the cost of grading and macadamizing the street. Both ordinances, the one for appropriating the property and the other for improving the street, were passed after a suspension of the rules which required a reading on three different days, but at the same time on one vote and one roll-call of yeas and nays the rule was suspended as to other ordinances of a similar character, so that in order to determine whether this was legal, it was necessary to find whether the ordinances were of a general or permanent nature, and so required more than one reading. On this subject I will read what the court say on page 469:

"Whether these ordinances were of a gen-

eral nature, we deem it unnecessary to determine in the decision of the present case; but, in our judgment, the ordinances were of a permanent nature as distinguished from such as are of a temporary character. The subject matter of the ordinances was of a permanent nature—the same test we would apply in making the character of a law as general or local, to depend on the character of its subject matter. Property was to be condemned for the purpose of extending a street."

On page 470:

"A distinction is sometimes drawn between an ordinance and a resolution, by which, the one prescribes a permanent rule of conduct or government, while the other is of a temporary character, and prescribes no permanent rule of government. The statute, however, refers both to "resolutions and ordinances of a general or permanent nature.' But in Upington v. Oviatt, 24 O. S., 232, in which the preliminary resolution declaring the necessity of the proposed improvement was not read on three different days, nor such readings dispensed with by a vote of three-fourths of the members elected, the court say: 'It was not a resolution of a permanent nature. It made no provision for the future, and simply declared an existing fact.' With such criteria of a temporary resolution, in the given instance, we would readily distinguish the ordinances under consideration as having a continuous effect, and permanent nature, within the statutory meaning."

On page 473:

"It is contended, however, that the provisions of sec. 1694 are to be treated as directory only; but, notwithstanding a conflict of authorities, we are not disposed to depart from the principles announced in Bloom v. Xenia, and, in accordance with the decision of that case, we think, the provisions of the section should be held to be imperative or mandatory. Whether a provision of the constitution as to the passage of laws is mandatory or directory to the legislature will not furnish unerring guidance in municipal legislation. The whole legislative power of the state is vested by the constitution in the general assembly, subject to the special limitations contained in that instrument upon the exercise of that power; and if there is an apparent failure to comply with the constitutional directions, the judicial department of the government will not forget that every reasonable intendment is to be made in favor of the proceedings of the legislature. 'It is not to be presumed that the assembly, or either house of it, has violated the constitution.'

But municipal corporations act not by an inherent right of legislation, like the legislature of the state. They are governments of enumerated powers acting by a delegated authority. They are creatures of the statute, invested with such power and capacity only as is conferred by the statute, or passes by necessary implication from the statutory grant, and their powers must be strictly observed. Such statutory powers constitute conditions precedent; and unless the ordinance is adopted in

compliance with the conditions and directions thus prescribed, it will have no force.

"In Clark v. Crane, 5 Mich., 151, the Supreme Court laid down the rule that 'what the law requires to be done for the protection of the tax payer is mandatory, and cannot be regarded as directory merely.' The requirement that ordinances of a general or permanent nature, shall be fully and distinctly read upon three different days, being designed as a safeguard against rash and inconsiderate legislation, and being in a degree essential to the protection of the rights of property, it should likewise be deemed a mandatory measure intended as a security for the citizen."

In the case of Elyria Gas and Water Co. v. Elyria, 57 O. S., 374, an action was brought by the Elyria Gas and Water Co., a tax payer, under sec. 1778, R. S., after the city solicitor had refused on request, to bring the action. The action was brought to enjoin the city and its mayor and clerk from issuing and selling bonds of the city for the purpose of raising funds with which to build water works. The case is practically stated in the syllabus:

1. "The proceedings of the council of a municipal corporation must, in order to be valid, be within the powers conferred on it, and in substantial conformity with the statutes regulating them.

2. "The proper adoption, by the council, of the resolution declaring it to be necessary to issue and sell the bonds of the corporation for a specified purpose authorized by sec. 2835, of the Revised Statutes, and providing therein for the submission of the question of their issue to the electors at an election to be held for that purpose, is essential to the validity of all subsequent proceedings, and without which there can be no lawful issue or sale of the bonds.

3. "Such a resolution is of a general and permanent nature, within the meaning of sec. 1694 of the Revised Statutes, and must, before it can be legally adopted by the council, be read on three different days, or the rule requiring such reading be dispensed with by three-fourths of the members elected to the council.

"The last clause of par. 6 of the syllabus is pertinent to a question that was discussed upon the argument:

"The abuse of corporate powers, within the purview of sec. 1777, includes the unlawful exercise of powers possessed by the corporation, as well as the assumption of power not conferred."

I will not take time to read from the opinion in that case, although there is a pretty full discussion. There are other decisions, earlier decisions, of the Supreme Court, and also reported decisions of the lower courts, quite a number of them, which have passed upon particular resolutions. Some are held to be of a general or permanent nature, and others of a special or temporary nature. I have examined all of them, but feel that this case is controlled by the two Supreme Court decisions which I have cited. The subject matter of the resolution in this case was the sale by the city of its entire gas plant, including the right of the purchaser of a part of it at least to perpetually

maintain and operate it for the purpose of furnishing gas to people of the city. It was not a private matter. It was not a matter in which the parties to the transaction were alone interested. All the consumers of gas within the city, present and prospective, and all the tax payers of the city, were interested. The fact that the resolution may not amount to anything; that no bids may be filed, or that all bids may be rejected, or that the council may decide not to sell the property, does not change the nature of the resolution. It sets on foot proceedings the object of which is to permanently dispose of the gas plant and permanently bestow its maintenance and operation upon private individuals. In the Elyria case the bonds of the city could not be issued until the electors of the city had voted in favor of it. The resolution simply declared the necesity of issuing the bonds, and directing that the question of issuing the bonds be submitted to the electors of the city at a general election to be held on a certain day. If two-thirds of the electors did not vote in favor of issuing bonds, the bonds would not be issued, and the council could proceed no further, and nothing would result from the resolution. Notwithstanding that, the resolution was held to be one of both a general and permanent nature. And further in that case, the bonds could not be issued or sold until an ordinance was passed directing them to be issued. I am of the opinion that the resolution directing the clerk to advertise for bids was not legally adopted, and that the subsequent proceedings of the council as to the sale of both parts of the plant were for that reason in contravention of law.

But it is said that so far as the sale of the outside part of the plant is concerned, the city has ratified the transaction by receiving and retaining the purchase price, and by acknowledging through the council that the company is the owner of the property, and by directing the gas trustees to turn the property over to the company. And it is said that by reason of these facts the city is now estopped from setting up defects and irregularities in the proceedings. It is claimed that the rules apply which would govern a transaction between individuals under like circumstances. In support of these propositions the case of Cincinnati v. Cameron, 33 O. S., 336, is relied upon, and other cases of a similar nature are cited. In the Cameron case the plaintiff entered into a contract with the city of Cincinnati for the construction of a hospital building, and sued the city to recover the amount due for the construction. The statute under which the hospital was constructed provided that "it should be stipulated in the contract that the contractors will not execute any extra work unless ordered in writing by the board of hospital commissioners, and that they will not claim for such extra work unless such written order was given. The contract contained that stipulation. Extra work was ordered by the board, but no written order was given, the board informing the contractor that written orders were not necessary. The work was satisfactory, and the city received and enjoyed the

benefit. It was held that the action of the board amounted to a waiver of written orders, and that the fact that they were not given, under all the circumstances of the case, is not sufficient ground of defense against the contractor's claim of payment for work done. In discussing that branch of the case the court announces the rule which is found in par. 5 of the syllabus:

"There is a distinction between those powers of a municipal corporation which are governmental or political in their nature and those which are to be exercised for the management and improvement of property. As to the first, the municipality represents the state, and its responsibility is governed by the same rules which apply to like delegation of power. As to the second, the municipality represents the pecuniary and proprietary interests of individuals, and within the limits of corporate powers, the rules which govern the responsibility of individuals are properly applicable."

I will read what the court say in this case in closing the opinion—page 374:

"We desire further to say that the remarks heretofore made upon the heads "limits of expenditures,' and 'written orders," are to be regarded as applying strictly to the case in hand. The authorities on the subject of municipal liability, when and how the body may be bound, what its extent of authority is, under what circumstances it may deny, are not at all uniform. A remark as apposite as any we have happened to meet, is that of Field, C. J., in Argenti v. San Francisco, 16 Cal., 233: 'Upon the general subject of the extent of the liability of a municipal corporation, the authorities are a tangled web of contradictions, and it is difficult to assert any proposition with respect to the same, for which adjudications on both sides may not be cited.'

"Therefore it is that words should be restrained unto the 'fitness of the matter.'"

These closing remarks warrant me in referring to some subsequent decisions of the Supreme Court where the questions arose under similar circumstances—that is, in suits by contractors against the city to recover for work done when the work was satisfactory and accepted and used and enjoyed by the city, and in which case the court declined to hold that the city was estopped from setting up as a defense defects and irregularities in the proceedings.

In the case of McCloud v. Columbus, 54 O. S., 439, the plaintiff sought to recover of the city on a contract for grading and paving a street. It was held that the contract was not valid, because bids were not advertised for in the manner prescribed by law, and the city was not liable. In the case of Lancaster v. Miller, 58 O. S., 558, the plaintiff sued the city to recover a balance for the construction of a sewer. It was held that the contract was invalid because bids were not advertised for according to law, and that the city is not estopped to set up such omission as a defence. It is not necessary for me to distinguish these cases (and no doubt they may be distinguished). Nor is it necessary to review the other

decisions of a like nature that were cited, because the principles upon which these decisions are based do not, I think, have any application to this case. There is no issue here between the city of Toledo and The Kerlin Bros. Co. as to this sale. The city is not defending against the claim of the company to the property. The council desire that the company shall have the property—I mean the outside part of the plant—and that is the matter that is under discussion now—and the council have done everything in their power to put the title to the outside part, and the possession in the company; but the proceeding here is by tax payers or in behalf of tax payers to prevent the performance of a contract on the ground that it is illegal. By sec. 1777 R. S., the city solicitor is authorized; not only that, he is required, to bring an action in the name of the corporation, whenever the circumstances demand it, to enjoin the misapplication of funds of the corporation, or the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the corporation in contravention of law; and by sec. 1778 any tax payer of the corporation may, in his own name on behalf of the corporation, bring such an action, if the solicitor, after written request, refuse to bring it. The Supreme Court say in the case of R. R. Co. v. Smith, 29, O. S., 121, that taking these two sections together, namely, sec. 1777 and 1778, it is manifest that the particular object the legislature had in view was to provide convenient remedies for the protection af the tax payer against the violation of sec. 1777. The action is prosecuted for the benefit of tax payers, if not in their name, and proceeds upon the theory that the city is abusing its corporate powers, or about to execute or perform a contract which is in violation of law. The city is still in possession of the property, and until it is delivered to the company, the transaction is not completed; and the object sought in the city solicitor's action, and in his cross-petition filed by him in the replevin suit, is to prevent the delivery of the property and the complete performance of the contracts. and if the contracts are illegal, no question of estoppel or ratification can arise.

In the action brought by the city solicitor he asks for an injunction against the sale of only the inside portion of the plant and the real estate connected with the outside portion. In my judgment it would have been entirely proper to include in this action the whole plant, and to ask for an injunction against the prosecution of the replevin suit until the validity of the sale should be determined in the application made by him. But in his cross-petition filed in the replevin case he asks for similar relief as to the remainder of the property, being the property described in the replevin petition. I know of no reason why this cannot be done, and in so doing he is acting in the performance of his duty prescribed by sec. 1777. In view of the action of the council in acknowledging that the company is the owner of the outside part of the plant, and in directing that it be delivered to the company, the solicitor

could rightfully draw and file the cross-petition in the replevin case only as an application for an injunction under and by virtue of sec. 1777. The cross-petition has all the features of an application to the court under that section. It is filed in the name of the corporation, as required by that section. And after setting out all the proceedings of the council, he alleges in the language of the section that the attempted sale of the property described in the petition and of the remaining property constituting the natural gas plant of the city, is an abuse of the corporate powers of the city, and in contravention of the laws governing the same; and he asks for an injunction restraining The Kerlin Bros. Co. from in any manner taking possession of the property described in the petition, and that the pretended sale of said property be declared null and void.

Another question was raised which it is necessary to consider, and that is, whether the plaintiffs in what is known as the "gas trustees' suit" have the right to maintain the suit. It is conceded that the mayor is not a necessary or a proper party; and no reason has been given why the city of Toledo is a proper party. It is sufficient to say that the action was not brought by the solicitor in the name of the city under sec. 1777 R. S., and it is not claimed that the city authorized the bringing of the suit, either expressly or impliedly. As to the rights of the gas trustees to bring the suit, very little need be said. The rule is, and I do not find that it is denied or doubted anywhere, that public officers as such, have no right to bring suits in their own names, unless authorized to do so by statute. Dillon on Municipal Corporations, sec. 237, and note; Putnam v. Valentine, 5 O., 187; Hunter v. Field, 20 O., 340; Hunters v. Commissioners, 10 O. S., 515. The statute nowhere gives to the gas trustees authority to bring suits. Counsel for the trustees contend that the suit is authorized by sec. 4995 R. S., which provides that a trustee of an express trust may bring an action without joining with him the person for whose benefit it is prosecuted. Sec. 4993 is as follows:

"An action must be prosecuted in the name of the real party in interest, except as provided in sections 4994 and 4995.

"Section 4995. An executor, administrator or guardian, a trustee of an express trust, a person with whom, or in whose name, a contract is made for the benefit of another, or a person expressly authorized by statute, may bring an action without joining with him the person for whose benefit it is prosecuted; and officers may sue and be sued in such name as is authorized by law."

The words "trustee of an express trust" have in law a well understood meaning, and of course it is with such meaning that they are used in sec. 4995. A trust, as defined by Justice Story, is an equitable right, title or interest in property, real or personal, distinct from the legal ownership thereof. An express trust is one that is created by the owner of property deliberately or intentionally, either

in writing or by parol, in which the terms employed expressly designate the person, the property, and the object of the trust; and the trustee of an express trust is the person in whom the trust estate is vested. While public officers may be designated as trustees, or directors, or agents, they are not in any legal sense trustees of an express trust. I have examined all the authorities cited by counsel for the trustees, and am not persuaded that they sustain his position. My conclusion is that the plaintiffs in the gas trustees' suit have no right or authority to maintain the suit.

There was considerable discussion as to the right to an injunction against the prosecution of the replevin action, and many authorities were cited. I take it that this discussion had reference mainly to the gas trustees' suit, as an injunction against the prosecution of the replevin action was a part of the relief asked for in that suit. It is evident that the relief asked for by the solicitor, both in his petition and his cross-petition cannot be obtained on the presentation and trial of the legal issues in the replevin case. His remedy is solely in equity under the statute. If the replevin case is allowed to proceed, the plaintiff will obtain possession of the property in due course of the proceedings in that case, which the solicitor wants to prevent. That can only be done by injunction. In the ordinary action of replevin, where the property is confessedly personal, and is susceptible of delivery by the officer to the plaintiff on the giving of a bond, or by the officer to the defendant on the giving of a counter bond, and where all the grounds for equitable relief which the defendant has he may set up as a defense in the replevin suit, then he has an adequate remedy at law, and the rule is unquestioned that injunction will not lie. But the situation here is peculiar and unusual, and I may safely say without precedent. Whether the property is real or personal is in dispute. It ought not to be treated as personal and detached by the officer holding the writ of replevin until that question is settled. Again, to appraise the property as required, it must be examined, and as it consists largely of pipes L tried in the ground, it cannot be examined and delivered in all reasonable probabilitiy without severing the plant and cutting off the supply of gas from the city's consumers. While I think that the injunction prayed for in the cross-petition, restraining the plaintiff from taking possession of the property, in effect includes a suspension of the replevin proceedings which will result in a delivery of the property to the plaintiff; yet, under the prayer for general relief, the injunction should be made broad enough to include a stay of all proceedings in the replevin action.

Final decrees will be entered in these actions as follows: In the replevin case, final decree in favor of the defendant for injunction as prayed for, including a stay of the replevin proceedings; in the city solicitor's action, a final decree of injunction will be entered in favor of the plaintiff as prayed for; in the gas trustees' suit, the motion for an injunction will

be overruled and the petition dismissed, and judg nent rendered for the defenda' ts.

Hamilton & Kirby, and E. W. Tolerton, Esq., for Kerlin Brothers Co.

M. R. Brailey, City Solicitor, C. S. Northup, and Hurd, Brumback & Thatcher, for the other parties.